IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

**DENNIS LEROY GORDON**,

   Petitioner,

 v.

**OREGON BOARD OF PAROLE**,

   Respondent.

Case No. 6:23-cv-01317-IM

**OPINION AND ORDER**

**IMMERGUT, District Judge.**

   Petitioner Dennis Leroy Gordon ("Gordon"), an adult in custody ("AIC") at the Oregon State Penitentiary, brings this habeas corpus proceeding pursuant to 28 U.S.C. § 2254 ("Section 2254") challenging the Oregon Board of Parole and Post-Prison Supervision's (the "Board") deferral of Gordon's release from prison after finding that Gordon suffers from a present, severe emotional disturbance that constitutes a danger to the health or safety of the community. Because Gordon fails to demonstrate that the Board unreasonably applied clearly established federal law

PAGE 1 – OPINION AND ORDER

when it deferred his prison release date, the Petition for Writ of Habeas Corpus (ECF No. 1) must be denied.

## BACKGROUND

### I.    Gordon's Crimes

The Board, the Oregon appellate courts, and several judges of this Court have recounted the details of Gordon's crimes in numerous orders and decisions during the course of his incarceration. Because reciting those details anew would be of limited benefit to the resolution of this case, the undersigned relies on a summary of the relevant facts as previously set forth by the Oregon Court of Appeals:

> On September 4, 1975, [Gordon] arrived in Roseburg after committing a robbery and several thefts in Medford. He engaged a husband and wife, both strangers, outside of their home and then entered their residence after observing the husband drive away. [Gordon], at gunpoint, sodomized and raped the wife and told her that he or his friends would "get her" if she told anyone about the attack. After [Gordon] left, the victim reported the crime to the police, and [Gordon] was quickly apprehended. [Gordon] was released on bail, and he returned home to The Dalles.
>
> Three weeks later, [Gordon] chartered a plane and returned to Roseburg, carrying a hunting knife that he had purchased two weeks earlier. Upon arrival, he confirmed the victim's husband was away and then entered the victim's house through the unlocked front door. [Gordon] told the victim that he had a gun and that she must go with him. She said she would go if she could bring her children with her. [Gordon] put the victim and her two children (aged six months and two years old) into her car. He drove the car away from the city and then stopped the car. [Gordon] attacked the victim in front of her children by stabbing her repeatedly in the chest and abdomen and placed her body on the rear floorboards of the back seat at the feet of her two-year-old child. At some point, [Gordon] severed the victim's head using a pocket knife, believing this would make identification of the body more difficult.[1] [Gordon] removed the decapitated body

---

[1] "Petitioner said he recalled a *Hawaii Five-O* television show in which the murderer used this technique. An autopsy determined that the victim may still have been alive when petitioner decapitated her."

from the car, hid the body in a drainage ditch, and covered the body with gravel.[2] [Gordon] abandoned the car and the children and secured a ride in a passing vehicle to a plywood plant. There he stole a pickup truck from the plant parking lot. He placed the victim's head on the right front floorboards of the pickup and drove to a construction site about a half-mile away, where he buried the victim's head.

Meanwhile the victim's children remained in the car for approximately two and half hours before they were found, covered in blood. The two-year-old was in a semicatatonic state, softly crying for his mother. Later that evening, after 10:00 p.m., police observed what appeared to be a decapitated body lying in a drainage ditch, almost totally covered with gravel, and determined it might be the woman who had been raped three weeks earlier and was missing from the abandoned vehicle.

[Gordon] then drove to the airport and returned to Hood River on the same chartered plane he arrived in. In Hood River, [Gordon] immediately changed into an extra set of clothes he had left under the seat of his pickup. Then he drove home to The Dalles and was soon placed under arrest for the murder. When questioned later, [Gordon] lied, claiming that he murdered the victim after she had taken a knife from the glove box and swung at him, and that the victim fabricated the rape charge to make her husband jealous.

*Gordon v. Bd. of Parole and Post-Prison Supervision*, 246 Or. App. 600, 602-03 (2011), *rev.*

*denied*, 352 Or. 341 (2012) (footnotes in original).

Gordon ultimately pleaded guilty to Murder and Rape in the First Degree. The trial court

thereafter imposed an indeterminate sentence not to exceed life imprisonment for the murder,

and a consecutive indeterminate twenty-year sentence for the rape. (Resp't Exs. (ECF No. 21),

Ex. 101 at 6-9.[3])

## II.    Relevant Parole Rules

When Gordon committed his crimes, Oregon sentenced offenders under the

"discretionary" system, which required each offender to serve an indeterminate sentence with

---

[2] "The facts regarding the movement of the body from the car to the drainage ditch are unclear from the record."

[3] When citing to Respondent's exhibits, this Court refers to the exhibit page numbers located in the bottom right corner of each page.

periodic review by the Board to determine whether that individual was suitable for release on parole. *Gordon v. Bd. of Parole and Post-Prison Supervision*, 343 Or. 618, 620 (2007). In 1977, the state legislature replaced the discretionary system with the "matrix" system. *Id.* at 621. Under the matrix system, most individuals in custody receive a firm parole release date that may be postponed only in limited circumstances. *Id.* at 621-22. Offenders who committed crimes prior to the adoption of the matrix system may elect to be treated under the matrix system, with his or her parole eligibility determined by the statute and rules in effect at the time of that election. *Id.* at 622-23.

At all relevant times, Oregon Revised Statute ("ORS") § 144.125(3) provided that "[i]f a psychiatric or psychological diagnosis of present severe emotional disturbance such as to constitute a danger to the health or safety of the community has been made . . . , the board may order the postponement of the scheduled release date." 1981 Oregon Laws, c. 426, § 2; 1987 Oregon Laws, c. 320 § 53; *see also Gordon*, 343 Or. at 627 n.7. In *Weidner v. Armenakis*, the Oregon Court of Appeals held that the Board may consider all relevant information in the record to determine whether an individual in custody suffers from a severe emotional disturbance pursuant to ORS § 144.125(3). 154 Or. App. 12, 17-18 (1998), *withdrawn order* July 13, 1998, *reasoning reaff'd and readopted by Merrill v. Johnson*, 155 Or. App. 295 (1998); *Gordon*, 343 Or. at 627. The Oregon Court of Appeals later concluded in *Peek v. Thompson*, however, that a 1988 revision to Oregon Administrative Rule ("OAR") 255-60-006 required "a formal finding in the psychiatric or psychological evaluation as a prerequisite to the Board's authority to extend a[n] [individual in custody]'s parole release date." 160 Or. App. 260, 264-66 (1999); *Gordon*, 343 Or. at 628-29. Thus, if the Board applies the 1988 version of OAR 255-60-006, the psychiatric or psychological report must provide the basis for finding that an individual suffers

from a severe emotional disturbance, whereas if the Board applies the rules in effect in 1984, it may rely on all pertinent evidence in the record. *Gordon*, 246 Or. App. at 606; *Gordon v. Bd. of Parole and Post-Prison Supervision*, 266 Or. App. 405, 407-08 (2014).

## III. Gordon's Parole Board History

Like the details of his crimes, Gordon's history before the Board is well-documented in various orders and opinions by the Board, the Oregon Courts, and several judges of this Court. Because that history is relevant but not determinative to the outcome in this case, the undersigned relies on prior decisions, in addition to Respondent's Exhibits, to summarize Gordon's lengthy history before the Board.

### A. Gordon's Election to Proceed Under the Matrix System

As the relevant parole rules make clear, "[t]he date of [Gordon]'s election into the matrix system is significant because it affects the information on which the board may rely in determining whether [he] has a present severe emotional disturbance for the purposes of ORS [§] 144.125(3)(a)." *Gordon*, 266 Or. App. at 407.

Gordon first elected to be considered under the matrix system during a hearing before the Board on August 1, 1984. (Resp't Ex. 104 at 66.) However, the Board later discovered that the hearing had not been properly recorded and "voided" the proceeding. (*Id.* at 67, 70.)

At a subsequent hearing on May 15, 1985, Gordon declined consideration under the matrix system, electing instead to be considered for parole under the discretionary system in effect at the time of his crimes. (*Id.* at 73.) During a discussion with Gordon, one Board member agreed with Gordon's assertion that his 1984 election was invalid because the board action had been voided. *See Gordon*, 343 Or. at 624. Consistent with that view, the Board Action Form

("BAF") memorializing that proceeding stated that "Gordon signed application for purposes of *remaining* under the Discretionary System." *Id.*

In August 1988, Gordon again opted into the matrix system. (Resp't Ex. 104 at 85, 88.) Pursuant to that election, the Board established August 15, 1999 as Gordon's parole release date. (*Id.* at 99-100.)

### B. The Board's Deferral of Gordon's Parole Release Date

#### 1. BAFs #8 and #14

On February 2, 1999, the Board determined that Gordon was suffering from a present severe emotional disturbance and deferred his parole release date by twenty-four months. (Resp't Ex. 104 at 103) The Board thus reset Gordon's parole release date for August 15, 2001, memorializing its decision in BAF #8. (*Id.*)

Gordon sought administrative review, and the Board responded. In Administrative Review Response ("ARR") #3, the Board stated that "it is the Board's policy for discretionary [individuals in custody] who opt into the matrix system to apply the rules in effect at the time the [individual] opts into the matrix system[,]"and noted that Gordon had opted into the matrix system on August 27, 1988. (*Id.* at 108.) Because Gordon's 1988 election rendered *Peek* applicable to the Board's decision (*i.e.*, requiring a formal finding in a psychiatric or psychological evaluation to extend an individual's parole release date), the Board relied solely on a psychological evaluation conducted by Dr. Ronald Page to conclude that Gordon suffered from a severe emotional disturbance. (*Id.*)

The Board subsequently reopened the matter on its own motion in June 2003, correcting ARR #3 to reflect that Gordon first elected to proceed under the matrix system on August 10, 1984 (thereby rendering *Peek* inapplicable and allowing the Board to consider all relevant

PAGE 6 – OPINION AND ORDER

evidence in the record). (*Id.* at 122.) The Board noted that its reliance on Gordon's 1988 election had been in error, and that "[i]t is the Board's policy, when an offender opts into the matrix system on more than one occasion, to consider the laws in effect at the time that the offender first opts in" (*Id.*) However, the Oregon Supreme Court determined that the Board's policy "to use the rules in effect at the time of an [individual in custody]'s first election" was inconsistent with prior Board practice, and that the Board had "not offered a rational, fair, or principled explanation for the inconsistency." *Gordon*, 343 Or. at 637. The Oregon Supreme Court thus reversed and remanded to require the Board to provide an explanation for departing from its prior practice of relying on Gordon's 1988 election. *Id.*

On remand, the Board issued BAF #14, explaining that it chose to rely on Gordon's 1984 election because a parole release decision "should be based on as much information as lawfully possible to determine, among other things, the offender's understanding of the commitment offenses, the identification of static and dynamic risk factors, and the ability of the offender to be adequately supervised in the community." (Resp't Ex. 104 at 142.) The Board further explained that prior to *Peek*, "an offender could opt in and opt out [of the matrix system] without it making a substantive difference[,]" but that the intervening change in law created "a possibility of two substantive standards applying (that is pre-*Peek* as articulated in *Weidner* versus *Peek*)[,]" prompting the Board to "choose the standard that provides the most information available, viz., the non-*Peek* standard." (*Id.*) The Board nevertheless held that, even under *Peek*, "there was sufficient evidence in Dr. Page's report for the Board to find that [Gordon] suffered from a present severe emotional disturbance such as to constitute a danger to health or safety of the community." (*Id.* at 144.) The Oregon Court of Appeals affirmed, *Gordon*, 246 Or. App. at 613, the Oregon Supreme Court denied review, *Gordon*, 352 Or. at 341, and this Court denied habeas

relief, *Gordon v. Premo*, No. 6:13-CV-00130-MA, 2015 WL 1931975, at *8 (D. Or. Apr. 28, 2015).

### 2.  BAFs #12 and #15

In the interim, on March 16, 2005, the Board issued BAF #12 and deferred Gordon's parole release date, again applying the administrative rules in effect when Gordon first opted into the matrix system in 1984. (Resp't Ex. 104 at 128.) The Board thus considered all pertinent evidence in the record to determine that Gordon continued to suffer from a severe emotional disturbance. (*Id.*) However, the Oregon Court of Appeals reversed and remanded for consideration of the Oregon Supreme Court's decision concerning BAF #8, as discussed above. *Gordon v. Bd. of Parole and Post-Prison Supervision*, 218 Or. App. 374 (2008).

On remand, the Board reaffirmed that Gordon "should be treated as having opted in the matrix system in 1984, rather than in 1988," and that his release date was "governed by the rules in effect at the time of [his] 1984 election, and not the rules in effect at the time of his 1988 election into the matrix system." (Resp't Ex. 104 at 147.) The Board then concluded that, "regardless of whether the 1984 or 1988 rules govern[,] . . . and regardless of the proper interpretation of the 1988 rules, . . . at the time of his exit interview in 2005, [Gordon] had a present severe emotional disturbance that constituted a danger to the health or safety of the community and [therefore] . . . deferral is appropriate." (*Id.*) The Oregon Court of Appeals affirmed without opinion, *Gordon v. Bd. of Parole and Post-Prison Supervision*, 250 Or. App. 396 (2012), the Oregon Supreme Court denied review, *Gordon v. Bd. of Parole and Post-Prison Supervision*, 352 Or. 341 (2012), and this Court denied habeas relief, *Gordon v. Franke*, No. 2:13-cv-00052-HU, 2015 WL 881589, at *1 (D. Or. Mar. 2, 2015).

///

PAGE 8 – OPINION AND ORDER

### 3. BAF #18

On February 9, 2011, the Board issued BAF #18 and again deferred Gordon's release

date. (Resp't Ex. 104 at 168.) The Board explained its decision, as follows:

> Based on the doctor's report and diagnosis, coupled with all the information that
> the Board is considering, the Board concludes that [Gordon] suffers from a
> present severe emotional disturbance that constitutes a danger to the health and
> safety of the community. The Board has considered the matter under the
> substantive standard in effect at the time [Gordon] opted into the matrix system,
> 08/01/1984, and all other applicable rules and laws.

> The Board further finds that it is not reasonable to expect that [Gordon] will be
> granted a firm release date before 10 years from [his] current projected release
> date. Therefore the Board is deferring [Gordon's] projected release date and
> establishing a projected release date of 08/15/2021 following a total of 551
> months. A review will be scheduled in 02/2021, with a current psychological
> evaluation.

(*Id.*)

Gordon sought administrative review, arguing that the Board had violated his

constitutional right to due process "by applying the wrong rules to [his] case" based on "an

erroneous determination that his matrix opt-in date is 1984."[4] (*Id.* at 182.) Noting that Gordon

had previously raised that claim and relying on its reasoning in BAF #14, the Board concluded

that it was "not persuaded . . . it should abandon the stance it has taken on this issue in previous

Board actions" and that it would "continue to apply the rules in effect in 1984, when [he] first

opted into the matrix system[.]" (*Id.*)

The Oregon Court of Appeals subsequently issued a lengthy opinion, concluding that

Gordon's 1984 election into the matrix system was valid, and that the Board had offered a

"rational, fair, and principled explanation for departing from its practice of relying on [Gordon]'s

---

[4] Gordon also argued that the Board committed an ex post facto violation by applying
ORS §§ 144.125(3)(a) and 144.280 and deferring his parole release date for longer than two
years. (Resp't Ex. 104 at 182-83.)

1988 election" *Gordon v. Bd. of Parole and Post-Prison Supervision*, 267 Or. App. 126, 144-46 (2014) (simplified). The Oregon Court of Appeals thus affirmed the Board's deferral of Gordon's parole release date, *id.* at 149, and the Oregon Supreme Court denied review, *Gordon v. Bd. of Parole and Post-Prison Supervision*, 357 Or. 324 (2015).[5]

## IV.    The Board Proceedings at Issue in the Instant Case

On February 17, 2021, the Board conducted a lengthy exit interview, during which Gordon testified about a variety of topics, including his physical and mental health, employment history, programming and reformation activities, criminal history, and the crimes for which he is incarcerated. (Resp't Ex. 104 at 335-520.) During his testimony, Gordon attributed his criminal behavior to "serious antisocial [personality] features" (*id.* at 399), explaining that he "had a problem with . . . being impulsive . . . [and] disregard[ing] the rights of other people" (*id.* at 365; *see also* 368 (stating that his tendency to be "extremely impulsive" was "one of the major reasons that crime happened"), 388 (explaining that "[a]t the end of four years [of participating in therapy] I came to the point where I fully recognized why I [raped and murdered the victim], I recognized that I was impulsive, I had a problem with considering the rights of . . . other individuals")).

Following that testimony, a Board member pointed out that many people are impulsive and lack respect for others, but that they do not stab people, behead them, and leave them at young children's feet. (*Id.* at 406.) The Board member further pointed out that Gordon had taken multiple steps—such as hiring an airplane, dressing up in disguise, flying to another city,

---

[5] Gordon later filed a habeas petition, but he did not challenge the Board's decision to apply the 1984 version of its rules. *See Gordon v. Premo*, No. 6:16-cv-01018-SI, 2017 WL 5615168, at *2 (D. Or. Nov. 20, 2017). This Court denied relief. *Id.* at *5.

scouting the victim's home to ensure her husband was away, and taking the victim and her children to another location to commit the murder—that had required significant resources and planning and therefore could not be considered "impulse decisions." (*Id.* at 407.) Gordon then agreed that "impulse . . . didn't have much to do with the crime[,]" and pointed instead to "emotional issues" stemming from rejection by his mother and first wife (*id.* at 408), alcohol use (*id.* at 410), his wife's refusal to engage in certain sex acts (*id.* at 445-49, 453-54), and his desire to avoid the consequences of his actions (*id.* at 457-59).

Despite his insistence that various personality traits and emotional issues had caused his criminal behavior, Gordon acknowledged that he was not participating in therapy or any other formal programming, except Alcoholics Anonymous ("AA"), at the time of the hearing.[6] (*Id.* at 381-83.) Gordon emphasized, however, that he had participated in four years of therapy when he was first incarcerated, and that his therapist, Dr. Schmahl, told him that he no longer needed therapy because he had "learned what [his] problems are . . . [and] how to deal with them[.]" (*Id.* at 388.) Gordon thus told the Board that he felt he "had a handle on [the] impulsivity and . . . disregard of rights of others[,] . . . understood it[,] and [was] ready to stop talking about those specific issues[.]" (*Id.* at 389-90.)

The Board then turned to Gordon's most recent psychological evaluation, which was conducted by Dr. Jennifer Johnson ("Dr. Johnson") in late 2020. (*See* Resp't Ex. 105.) Gordon stressed to the Board that Dr. Johnson had diagnosed him with antisocial personality traits, which

---

[6] Despite participating in AA for "maybe 30 years," Gordon indicated during the hearing that he has only worked "some" of the steps and could remember only "the important ones[.]" (Resp't Ex. 104 at 383.)

"does not qualify as a disorder."[7] (Resp't Ex. 104 at 421.) Although Gordon acknowledged that he has certain antisocial features, he insisted that "there's not enough there to cause a major problem as a whole." (*Id.* at 422.) After additional discussion, Gordon told the Board that he would not reoffend because throughout his lengthy term of incarceration, he has "dealt with every flaw in [his] personality that would possibly . . . cause [him] to go out there and commit another crime[.]" (*Id.* at 465.)

Applying the 1984 version of its rules (and therefore considering all pertinent evidence in the record), the Board found that Gordon suffers from a present, severe emotional disturbance such as to constitute a danger to the health or safety of the community, and again deferred Gordon's parole release date. (Resp't Ex. 104 at 525.) The Board detailed the "combination" of factors and concerns compelling its decision in BAF #24, emphasizing Gordon's inability, after 45 years of incarceration, "to articulate, in a meaningful and substantial way, the motivations that led [him] to rape and later murder an innocent young mother in front of her children." (*Id.*) The Board also noted Gordon's lack of effort to address his psychological and emotional issues through participation in cognitive programming or formal therapy, explaining that "the incredible depth of brutality and deviancy involved in [his] index crimes requires extensive, sustained cognitive work and resultant development to ensure this Board and the community that [he] is safe for release." (*Id.* at 523, 525.) The Board thus rejected Gordon's attempts to minimize the findings of his most recent psychological evaluation, explaining:

---

[7] Although prior psychological evaluations had resulted in a diagnosis of antisocial personality disorder, Dr. Johnson explained that based on Gordon's reported history, "there is limited evidence of conduct disorder with onset before age 15[,]" and that "without evidence of Conduct Disorder, a diagnosis of a personality disorder cannot be provided." (Resp't Ex. 105 at 23-25, 31-32.)

. . . Dr. Johnson diagnosed AIC with Antisocial Personality Traits and Alcohol Use Disorder, Moderate, in Sustained Remission, in a Controlled Environment. It appears that AIC reads Dr. Johnson's report to be a clean bill of health, opining that his diagnosis of Antisocial Personality Traits means that "there's not enough there to cause a major problem," and that his PCL-R score of 21 is de minimis because he "barely got classified, if you will."

Results of the PCL-R indicate that AIC meets the criteria for psychopathy with an overall score of 21, which indicates a moderate level of psychopathic characteristics as compared to male offenders generally. AIC's belief that he "barely got classified" is of concern to the Board, as Dr. Johnson's full analysis of what that score truly means reveals risk factors that need to be not only addressed but actively mitigated. First, Dr. Johnson states that "[H]is scores indicate he will continue to exhibit some glibness or superficial charm (e.g., superficial responses lacking depth upon follow up)," . . . "interpersonal manipulativeness (e.g., impression management and minimization)," . . . and "failure to accept responsibility (e.g., repeated minimization of culpability or denial in past records)." She goes on to say "it should be noted that the accuracy of the above-mentioned score and analysis is only as good as the information available, therefore, were Mr. Gordon to be minimizing his report of behavior and available records [were] not available to provide additional insight, the scores may be affected and possibly deflated."

To that end, Dr. Johnson repeatedly found that AIC was continually attempting to engage in positive impression management, finding " . . . it was noted that his effort to offer explanation or expound often served to either minimize or affect perception," and " . . . there is evidence that Mr. Gordon was attempting to minimize or conceal impairment. This raises concerns about possible underreporting regarding the validity of his profile," and "During the present evaluation and previous psychological evaluations, Mr. Gordon has acknowledged committing his index offense; however, he appears to rely heavily on mental health reasons for his behavior that do not align with facts of the case— thereby possibly minimizing his culpability or recognition of his behavior." AIC has struggled with minimization for decades, and it would appear as though that struggle remains today revealing itself in his psychological evaluation as well as at his hearing.

Finally, the Risk for Sexual Violence Protocol (RSVP) has specific criteria that indicate individuals who score 21 or higher on the PCL-R have a psychopathic personality disorder that functions as a construct relative to the risk of future sexual violence. AIC's dismissal of his moderate level of psychopathic characteristics as "barely getting classified" is concerning and demonstrative of his willingness to minimize his own personality and psychological deficits, allowing himself the ability to deny the existence of any potential risk factors that may remain and necessitate reflection and proactive mitigation. This analysis of AIC's PCL-R score is but one example from Dr. Johnson's report that highlights AIC's failure to understand what an opinion or diagnosis truly means, beyond the label given.

(*Id.* at 524-25.) The Board thus concluded that Gordon suffers from a present severe emotional disturbance and that, due to the number of concerns articulated in BAF #24 and the significant harm of which Gordon has shown he is capable, it would require at least three years "to address the primary concerns of the Board." (*Id.*) The Board therefore reset Gordon's parole release date to August 15, 2024. (*Id.* at 525.)

Gordon sought administrative review, arguing that under *Peek*, the Board could consider only his most recent psychological evaluation to assess whether he suffered a present severe emotional disturbance pursuant to ORS §144.125(3), and that the Board's consideration of the whole record violated his right to due process. (Resp't Ex. at 104 at 537.) Gordon also argued that his most recent psychological evaluation did not support a finding of present severe emotional disturbance because it was "void of a valid DSM-V diagnosis[.]" (*Id.* at 530-31.) In response, the Board explained that *Peek* does not apply to Gordon's case and therefore "the Board is not restricted to considering only the information in the psychological evaluation." (*Id.* at 569.) The Board further explained that despite Gordon's assertion to the contrary, "[i]t was clear from [the most recent psychological evaluation], and was further displayed during [his] hearing, that [his] antisocial traits remain present and are preventing [him] from developing the necessary insight to demonstrate a thorough understanding of the facts that led to [his] crimes, whether through official institution cognitive programming or through self-study." (*Id.* at 571-72.) The Board thus denied Gordon's claims.

Gordon then sought judicial review, again arguing that *Peek* applied to limit the Board's review, and that Dr. Johnson's psychological report did not contain sufficient evidence to support a finding of present severe emotional disturbance. (Resp't Ex. 106 at 7-9.) The Oregon Court of Appeals affirmed without opinion, *Gordon v. Bd. of Parole and Post-Prison*

PAGE 14 – OPINION AND ORDER

*Supervision*, 324 Or. App. 411 (2023), and the Oregon Supreme Court denied review, *Gordon v. Bd. of Parole and Post-Prison Supervision*, 371 Or. 127 (2023).

## IV.    Federal Habeas Corpus

On September 11, 2023, Gordon filed a Petition for Writ of Habeas Corpus in this Court, raising two grounds for relief in connection with BAF #24:

> **Ground One:**  Violation of Due Process of [Fourth] Amend[ment] to U.S. Constitution.
>
> **Supporting Facts:**  Board of Parole is relying on rules in eff[ect] 8-1-1984 based on Board Action Form dated 8-10-84. Records show: 1) inmate appealed hearing to court of appeals A33100; 2) appeal dismissed due to Board failing to make record; 3) Board voided form dated 8-10-84 due to no record of hearing in which form was signed for matrix treatment; 4) Board now attempts to use voided form of hearing after <u>no record kept for appeal</u>.
>
> **Ground Two:**  Violation of Due Process, [Fourth] Amend[ment] to U.S. Con[stitution]. Board of Parole denied parole based on finding severe emotional disturbance such as to constitute a danger when psych[ological] eval[uation] made no diagnosis of present disorder.
>
> **Supporting Facts:**  Psych[ological] eval[uation] made no diagnosis of present disorder, only listed "antisocial traits." However, doctor stated I did not have character disorder—that is antisocial personality disorder <u>could not be diagnosed</u>. Doctor further found low risk to reoffend.

(Pet. (ECF No. 1), at 5.[8]) Respondent urges this Court to deny habeas relief, arguing that the state-court decision denying Grounds One and Two is entitled to deference, and that Ground Two otherwise fails to state a valid claim for relief. (Resp. to Pet. (ECF No. 19) at 15-17.)

## <u>LEGAL STANDARDS</u>

The Antiterrorism and Effective Death Penalty Act ("AEDPA") prohibits relitigation of any claim adjudicated on the merits in state court unless such adjudication resulted in a decision that was (1) "contrary to, or involved an unreasonable application of, clearly established Federal

---

[8] The Court refers to the ECF-assigned pagination when citing to the Petition or the parties' briefing in this case.

law, as determined by the Supreme Court of the United States;" or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). The AEDPA thus imposes "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (simplified); *see also White v. Wheeler*, 577 U.S. 73, 76-77 (2015) (acknowledging that the "AEDPA, by setting forth necessary predicates before a state-court judgment may be set aside, erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court") (simplified).

A state-court decision is "contrary to" clearly established federal law if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" of clearly established federal law occurs if the state court correctly identifies the governing legal principle but misapplies that principle to the facts at hand. *See id.* at 407 (holding that "a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case"). The "unreasonable application" clause requires the state court's decision to be more than merely erroneous or incorrect. *See id.* at 411 (noting that "a federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly"). Rather, the state court's application of clearly established federal law must be objectively unreasonable. *See*

*id.* at 409 (instructing that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable").

Where, as here, a state court reaches a decision on the merits but provides no reasoning to support its conclusion, the federal habeas court must conduct an independent review of the record to determine whether the state court clearly erred in its application of Supreme Court law. *Delgado v. Lewis*, 223 F.3d 976, 982 (2000). In such instance, although the federal court independently reviews the record, it still lends deference to the state court's ultimate decision and will only grant habeas relief if the state court's decision was objectively unreasonable. *Harrington v. Richter*, 562 U.S. 86, 98 (2011); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

## **DISCUSSION**

Gordon alleges that the Board violated his right to due process by applying the 1984 administrative rules and considering the entire record to find that he suffered from a "present severe emotional disturbance" pursuant to ORS § 144.125. (Memo. Supp. Pet'r's Claims (ECF No. 27) ("Pet'r's Memo.") at 2-5.) Gordon also alleges that the Board's finding violates due process because "Dr. Johnson made no diagnosis of any disorder listed in the . . . DSM-V." (*Id.* at 7.)

"There is no right under the Federal Constitution to be conditionally released before the expiration of a valid sentence, and the States are under no duty to offer parole to their [individuals in custody]." *Swarthout v. Cooke*, 562 U.S. 216, 220 (2011) (simplified). Where a state creates a liberty interest in parole, however, "the Due Process Clause requires fair procedures for its vindication—and federal courts will review the application of those

constitutionally required procedures." *Id.* The only procedures required are that the individual in custody be given an opportunity to be heard and provided with a statement of reasons as to why his parole was denied. *Greenholtz v. Inmates of Neb. Penal and Corr. Complex*, 442 U.S. 1, 16 (1979). These minimal procedural protections constitute "the beginning and the end of the federal habeas courts' inquiry[.]" *Cooke*, 562 U.S. at 220.

Assuming Oregon law creates a liberty interest in parole, the Board provided Gordon with a copy of Dr. Johnson's written report and allowed him to submit for the Board's consideration information and materials he believed weighed in his favor. (Resp't Ex. 104 at 261-331.) Gordon then testified extensively during his six-hour exit interview, providing the Board with additional or clarifying information, advancing various arguments for his release, and challenging several aspects of his psychological evaluation and Dr. Johnson's findings. (*Id.* at 335-520.) After the exit interview, the Board issued BAF #24, memorializing in writing its decision to deny parole based on its finding that Gordon suffered from a present severe emotional disturbance rendering him a danger to public health or safety. (*Id.* at 522-27.) The Board explained in BAF #24 that its decision was compelled by Gordon's (1) failure to demonstrate an understanding of the factors leading to his criminal offense; (2) lack of effort to address his psychological and emotional problems; and (3) failure to seek out and benefit from cognitive programming and therapy. (*Id.* at 525.) Gordon thus received all the process he was due.[9] *See Cooke*, 562 U.S. at 220 (confirming that "[t]he Constitution . . . does not require more" than an opportunity to be heard and a statement of reasons why parole was denied (simplified)).

---

[9] To the extent the Due Process Clause prohibits the arbitrary application of state parole rules, this Court has twice determined that the Board's application of the 1984 rules was not arbitrary or capricious and was supported by "some evidence." *See Gordon*, 2015 WL 1931975, at *7-8; *Gordon*, 2015 WL 881589, at *6. As this Court explained in those decisions and

Gordon nevertheless insists that this Court must "look at the facts" concerning his 1984 matrix election, again arguing that such election was invalid, and that only the rules in effect at the time of his 1988 matrix election may be "legally" applied to his case. (Pet'r's Memo. at 2-3, 8.) However, the validity of Gordon's 1984 matrix election and the correct application of the Board's rules are state law matters, and Gordon "may not . . . transform a state-law issue into a federal one merely by asserting a violation of due process." *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996); *see also Cooke*, 562 U.S. at 222 (noting that it is well-settled that "a mere error of state law is not a denial of due process") (simplified); *Miller v. Or. Bd. of Parole and Post Prison Supervision*, 642 F.3d 711, 716-17 (9th Cir. 2011) (explaining that "the question" before a federal habeas court is not "whether the Board correctly applied Oregon's parole standards[,]" but "whether the state provided [the petitioner] with the minimum due process outlined in *Cooke*"). Indeed, this Court has previously rejected identical claims on that basis, *see Gordon*, 2015 WL 881589 at *6 (explaining that "[i]t is no part of [this court's] business to evaluate the state board of parole's application of its rules for determining parole eligibility" (simplified)); *Gordon*, 2015 WL 1931975 at *7 (explaining that where "the state affords the *procedural* protections required by *Cooke*, 'that is the end of the matter for purposes of the Due Process Clause'" (simplified)), and must otherwise defer to the Oregon Court of Appeals' determinations that Gordon's 1984 matrix election was valid, and that the Board could thus apply the rules in effect at the time of that election, *see Langford*, 110 F.3d at 1389 (explaining that a habeas court must "accept a state court's interpretation of state law" because its "concern is with [the petitioner's] federal rights").

---

recounted in the history above, the Board has provided principled reasons for continuing to apply the 1984 rules which are supported by ample evidence in the record.

Gordon also argues that his most recent psychological evaluation cannot support a finding of present severe emotional disturbance because it did not include a diagnosis of a present disorder. (*Id.*) However, "the only federal right at issue is procedural," and therefore "the relevant inquiry is what process [Gordon] received, not whether the state court decided the case correctly." *Cooke*, 562 U.S. at 222. As explained above, Gordon received constitutionally adequate process, and that is "the beginning and the end" of this Court's inquiry. *Id.* Accordingly, Gordon is not entitled to habeas relief.

## CONCLUSION

For the reasons stated, this Court DENIES the Petition for Writ of Habeas Corpus (ECF No. 1), and DISMISSES this proceeding, with prejudice. Gordon has not made a substantial showing of the denial of a constitutional right, and therefore this Court DENIES a Certificate of Appealability. *See* 28 U.S.C. § 2253(c)(2).

**IT IS SO ORDERED.**

DATED this 7th day of February, 2025.

/s/ Karin J. Immergut

Karin J. Immergut
United States District Judge